# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

COLEMAN CABLE, INC.,     )
a Delaware corporation,     )
             )
     Plaintiff,   )  No. 08-cv-5687
             )
  v.         )
             )
THE TRAVELERS INDEMNITY CO.,  )
a Connecticut corporation, and   )
FEDERAL INSURANCE CO.,    )
an Indiana corporation,     )
             )
     Defendants.  )
             )

## <u>MEMORANDUM OPINION AND ORDER</u>

MARVIN E. ASPEN, District Judge:

   Plaintiff Coleman Cable, Inc. ("Coleman") seeks payment from either Federal Insurance

Company ("Federal") or The Travelers Indemnity Company ("Travelers") pursuant to two

separate insurance agreements. Coleman's claims relate to the alleged theft of 904,470 pounds

of copper wire, valued at $2,053,146.90, from its production facility in Miami Lakes, Florida.

Subject to certain exclusions and limitations, Coleman's policy with Federal covers property loss

due to employee theft, whereas Coleman's policy with Travelers covers property loss due to

non-employee theft. Both Federal and Travelers move for summary judgment. Federal's motion

is denied, and Travelers' motion is granted.

## I. FACTUAL OVERVIEW

   Coleman is a Delaware corporation headquartered in Illinois that produces wire and cable

products. (Travelers' Statement of Undisputed Facts ("TSUF") ¶ 1.) Federal is an Indiana

corporation headquartered in New Jersey that sells insurance. (Federal's Statement of

Undisputed Facts ("FSUF") ¶ 2.)  Travelers is a Connecticut corporation headquartered in Connecticut that also sells insurance.  (TSUF ¶ 2.)  In 2005, Coleman maintained separate insurance policies with Federal and Travelers covering property loss due to different types of theft.  (*Id.* ¶ 15; FSUF ¶ 24.)

At that time, Coleman operated six production facilities around the United States, including one in Miami Lakes, Florida that produced extension cords and battery booster cables. (Coleman's Response to Federal's Statement of Undisputed Facts and Statement of Additional Facts ("R-FSUF") ¶¶ 50–51.)  The primary raw material used in production at Coleman's Miami Lakes facility was copper wire.  (*Id.* ¶ 53.)  There is no dispute that Coleman had some copper wire stolen from this facility in 2005.  (TSUF ¶ 23; FSUF ¶ 15.)  What is disputed is whether Federal, Travelers, or neither is obligated to pay Coleman and, if so, how much.

### A.  The Federal Policy

Subject to certain exclusions, the Federal policy covers "direct loss of Money, Securities, or Property sustained by an Insured resulting from Theft or Forgery committed by an Employee acting alone or in collusion with others."  (FSUF ¶ 25.)  The policy further provides that the insured may "offer a comparison between [its] inventory records and actual physical count of its inventory to prove the amount of loss, only where [it] establishes wholly apart from such comparison that it has sustained a covered loss caused by an identified employee."  (*Id.* ¶ 34.)

### B.  The Travelers Policy

Subject to certain exclusions, the Travelers policy covers "direct physical loss or damage to Covered Property[.]" (TSUF ¶ 16.)  It is undisputed that the copper wire used in the Miami Lakes facility is "Covered Property" within the meaning of the policy.  (TSUF ¶¶ 16–19.)  The policy also contains two exclusions that Travelers argues are applicable.  One exclusion, the

employee theft exclusion, relieves Travelers of any obligation to cover losses resulting from "dishonest or criminal act[s] by . . . employees . . . acting alone or in collusion with others[.]" (*Id.* ¶ 20.) Another exclusion relieves Travelers of any obligation to cover a "[s]hortage disclosed by audit or upon taking inventory or by a profit and loss statement or other instances where there is no physical evidence to show what happened to the property." (*Id.* ¶ 21.) Lastly, the Travelers policy also contains a $100,000 per occurrence deductible whereby Travelers is only obligated to pay "the amount of the loss or damage in excess of the specified deductible" for "any one occurrence" of a covered property loss. (*Id.* ¶ 22.)

### C. Evidence of Theft

Neither Federal nor Travelers disputes that Coleman was the victim of theft on September 11, 2005 and attempted theft on October 1, 2005 at its Miami Lakes facility. But Coleman also contends that these two incidents, as well as a third on September 25, 2005, were part of an ongoing scheme that predated September 11, 2005 and ultimately resulted in the loss of 904,470 pounds of copper wire. Coleman primarily relies on two types of evidence as proof of this scheme and its resulting loss: (1) surveillance videos and images of the three incidents and (2) a discrepancy between Coleman's physical and on-the-books inventory of copper wire as of September 2005. Federal and Travelers both challenge whether the surveillance evidence indicates a broader scheme predating September 11, 2005 and whether Coleman can use an inventory comparison to prove a total loss of 904,470 pounds of copper resulting from the scheme.

### 1. Surveillance Images and Related Testimony

During the summer of 2005, Coleman upgraded the security at its Miami Lakes facility. The interim plant manager, Mark Rogers, changed the keys to the front entrance of the facility, added a push button combination lock to the door for employees, and purchased master locks for the garage doors and accordion-style gates on the loading bay doors. (Coleman's Response to Travelers' Statement of Undisputed Facts and Statement of Additional Facts ("R-TSUF") ¶ 54.) Rogers, in conjunction with the incoming permanent plant manager, Joe Antonecchia, also replaced the facility's video surveillance system. (R-FSUF ¶ 56.) The old system consisted of six black and white cameras, which, due to their lack of infrared capability, had limited ability to capture images in the dark. (R-TSUF ¶ 52.) The new system, which was installed in July, consisted of sixteen cameras with infrared capability. (R-FSUF ¶ 58; Antonecchia Dep. at 15.) The new system also utilized digital video recording ("DVR") as compared to the old system's video cassette recording ("VCR"). (Antonecchia Dep. at 15.) In their role as plant managers, Rogers and Antonecchia reviewed footage from the video surveillance systems, although the parties dispute the regularity with which these reviews were conducted prior to the installation of the new system. (FSUF ¶ 11; R-FSUF ¶¶ 57–58; R-TSUF ¶¶ 52–53.)

### a. September 11, 2005

On September 12, 2005, while conducting a review of the previous night's surveillance video, Antonecchia observed undisputed evidence of theft. (R-TSUF ¶ 55; R-FSUF ¶ 60.) The video shows[1] an individual in Coleman's facility between roughly 9:50 p.m. and 11:00 p.m. on

---

[1] The parties agree on many aspects of the events depicted in the surveillance evidence. Most of their disagreements pertain to the appropriate interpretation to draw from these events. Throughout our recitation of the facts, we have identified the source of a particular interpretation when relevant. Because Coleman is the non-moving party with respect to both pending motions, we reasonably interpret the surveillance evidence in the light most favorable to Coleman. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986).

the evening of Sunday, September 11, 2005, which would have been outside the normal hours of operation. (Resp., Ex. 11.) Although the individual's face is obscured by a mask, he appears to be a man. (*Id.*, Surveillance Camera No. 16 at 23:00.) The individual first proceeds to the office where, according to Coleman, the keys to a forklift parked in the facility were kept. (*Id.*, Surveillance Camera No. 10 at 21:52; R-TSUF ¶ 57.) After obtaining the keys and starting the forklift, the individual uses the forklift to move less expensive materials out of the way in order to access more valuable reels of pure copper wire. (R-TSUF ¶ 57.) The individual then uses the forklift to move these reels, most of which weigh between 3,000 and 4,000 pounds, to the loading bay area. (*Id.* ¶ 49, 57–58.)

Meanwhile, video from another camera trained on the exterior of the facility depicts a second individual backing a flatbed truck up to one of the loading bays. (Resp., Ex. 11, Surveillance Camera No. 7 at 22:47; R-TSUF ¶ 58.) The second individual, who is not wearing a mask, then exits the vehicle and crouches near the front left tire of the truck. (Resp., Ex. 11, Surveillance Camera No. 7 at 22:50.) Back inside the facility, the first individual opens the loading bay door and accordion gate, both of which, according to Coleman, had padlocks with keys kept in a desk inside the facility. (*Id.*, Surveillance Cameras Nos. 15–16 at 22:49–22:54; R-TSUF ¶ 57.) The two individuals then load six reels of copper wire, weighing roughly 28,600 pounds and worth approximately $64,922, on to the flatbed truck. (TSUF ¶ 23.) The second individual then departs with the truck and its newly acquired cargo. (Resp., Ex. 11, Surveillance Camera No. 7 at 22:59.) The first individual remains in the facility, locks the doors that had been opened, returns some materials to their original places, and returns the forklift to its original place. (*Id.*, Surveillance Cameras No. 10, 13, 15, 16, at 23:00–23:02; R-TSUF ¶ 58.)

After observing this video, Antonecchia reported the theft to the police and also hired a private investigator.  (*Id.* ¶ 62.)  Antonecchia did not tell any employees at the Miami Lakes facility about the theft or the investigation in order to avoid arousing suspicion by employees who might have been involved.  (*Id.* ¶ 63.)  Antonecchia also installed an additional wireless camera, the so-called bucket cam, which was concealed in a bucket and trained on the outside door to the facility's compressor room.  (*Id.* ¶ 59.)  None of the surveillance system's cameras had recorded the forklift-operating thief's point of entry on September 11, 2005.  (Antonecchia Dep. at 29.)  As such, Antonecchia suspected that the thief had come through the door to the compressor room, which was not in view of the new surveillance system's cameras.  (*Id.*; R-TSUF ¶ 59.)

### b.  September 25, 2005

On Sunday, September 25, 2005, exactly two weeks after the initial theft, the surveillance system's cameras again recorded after-hours activity in the Miami Lakes facility.  (R-TSUF ¶ 65; Resp., Ex. 12, Surveillance Camera No. 13 at 21:50–21:58.)  As in the September 11 incident, the footage shows an unknown individual using a forklift to move large reels of copper wire to the loading bay.  (R-FSUF ¶ 65.)  Another unknown individual then arrives in a flatbed truck bearing substantial resemblance to the truck from the prior incident.  (Resp., Ex. 12, Surveillance Camera No. 15 at 22:17–22:19.)  This time, however, the driver remains at the loading bay for approximately two minutes before driving away without ever loading any copper reels on to the truck.  (*Id.*)  After the truck departs, the individual operating the fork lift continues to move the reels of copper around the facility, apparently, in Coleman's view, returning them to their proper places in order to conceal an aborted theft.  (R-TSUF ¶ 65; Resp., Ex. 12, Surveillance Camera No. 13 at 23:56–00:03.)

### c.  October 2, 2005[2]

On Sunday, October 2, 2005, thieves attempted to steal 44,000 pounds of copper wire, worth approximately $99,880, from Coleman's Miami Lakes facility in circumstances similar to the September 11 theft.  (TSUF ¶ 24.)  As before, the surveillance cameras recorded an unknown individual in the facility after normal working hours and in the vicinity of the loading bay.  (Resp., Ex. 15, Surveillance Camera No. 15 at 23:10:25–23:12:04.)  The cameras also recorded what appears to be the same truck from the two prior incidents arriving at the facility, parking next to the loading bay, and then departing.  (Resp., Ex. 15, Surveillance Camera Nos. 2, 6, 7, 9 15 at 00:36:43–00:48:36.)

Almost immediately after departing the facility, the driver of the truck was apprehended by the Miami police following a brief chase.  (R-TSUF ¶ 61.)  The driver had eight reels—or approximately 44,000 pounds—of copper wire in tow, which were ultimately returned to Coleman.  (Toyos Dep. at 16–19; TSUF ¶ 24.)  The driver, Luis Cruz, later pled guilty to the theft.  (Resp., Ex. 19.)  Months after the attempted theft, the police also arrested and charged another individual, Juniel Moreno, who is believed to have acted as a lookout.  (Toyos Dep. at 22–23.)  The record does not indicate what the outcome of Moreno's criminal case was.  It is undisputed that Cruz and Moreno were not Coleman employees.  (R-TUSF ¶ 61.)  Based on the surveillance images, the Miami police sought but never apprehended the individual shown operating the forklift.  (*Id.*)

### d.  Evidence of Employee Participation

Coleman says this evidence may implicate one or more of its employees in the theft and attempted theft.  Much of Coleman's argument about employee involvement requires inferences

---

[2]      Instead of submitting video footage from October 2, 2005, Coleman submitted still images taken by the surveillance system and authenticated by Joe Antonecchia.  (Resp., Ex. 15.)

to be drawn from the surveillance images and other circumstantial evidence.  Instead of setting out those proposed inferences here, we will evaluate them and their reasonableness during our application of the summary judgment standard below.

Coleman does offer direct evidence that may implicate two specific employees, however.  In particular, Coleman has produced still images taken by the so-called bucket cam purporting to show Francisco Miro, the maintenance supervisor at the Miami Lakes facility in 2005, propping open the door to the compressor room on October 1, 2005, hours before one of the attempted thefts.  (Antonecchia 8/5/10 Dec. ¶ 2 & Exs.)  Antonecchia had ordered this door to remain closed and locked based on his suspicion that the thieves were using it as their point of entry.  (Antonecchia Dep. at 60.)  Coleman has also produced images purporting to show Antonecchia locking the same door on October 1 prior to Miro allegedly unlocking it and propping it open.  (*Id.*; Antonecchia 8/5/10 Dec. ¶ 2 & Exs.)

Coleman also points to Joe Ramos, another Coleman employee, as a possible participant in the theft and attempted theft.  Coleman's only direct evidence is a statement Luis Cruz supposedly gave to the Miami police.  (R-FSUF ¶ 69.)  As part of Cruz's plea agreement pertaining to the September 11 and October 2 incidents, he supposedly identified Ramos as an accomplice.  (*Id.*; Resp., Ex. 19 at 4–5.)  Federal argues that this statement is inadmissible hearsay and contradicted by other evidence in the record.  (R-FSUF Resp. ¶ 69.)  Nevertheless, Coleman cites additional circumstantial evidence—such as Ramos' access to the facility on the weekends—as implicating him.  (R-FSUF ¶ 69.)

Despite its evidence of employee involvement, Coleman never disciplined or fired any employee for participation in the alleged theft scheme.  (FSUF ¶ 22.)  Coleman did not terminate

Miro and Ramos until mid-2006, when the Miami Lakes facility was closing. (FSUF ¶¶ 44, 46–47.)

### 2. Inventory Comparison

Coleman argues that the three instances of theft and attempted theft just described were the last in a series of thefts pursuant to a scheme predating September 11, 2005. (Resp. at 1–3.) After discovering the September 11 theft, Coleman physically counted its copper inventory at the Miami Lakes facility. (TSUF ¶ 25.) This count differed substantially from the inventory recorded on Coleman's books and records. (*Id.* ¶ 26.) Later, Coleman hired Deloitte Financial Advisory Services ("Deloitte") to determine the scope of the discrepancy. Relying on Coleman's inventory comparison, Deloitte calculated the discrepancy to be 904,470 pounds of copper. (FSUF ¶ 33; R-TSUF ¶ 66.) Deloitte valued this amount of copper at $2,053,146.90, although Federal's forensic accountant, Terrence Knight of Peters & Associates, valued it at $1,773,996.00. (R-TSUF ¶ 67.) Both Federal and Travelers argue that the terms of their respective policies preclude Coleman from calculating its alleged loss with this type of inventory comparison.

Travelers also offers additional evidence purporting to account for this inventory discrepancy. During May 2005, Mark Rogers, who was then acting as interim manager of the Miami Lakes facility, implemented a new accounting procedure to keep track of Coleman's copper inventory. (TSUF ¶ 11.) Coleman broke its copper inventory down into three categories: raw material, work in progress ("WIP"), and finished product. (*Id.* ¶ 9.) Prior to May 2005, employees at the Miami lakes facility would not record when copper wire was removed from the raw material inventory and put in to the WIP inventory—that is, in to production—until after the finished product had been completed. (*Id.* ¶ 11.) But Rogers changed this practice and began

requiring employees at the Miami Lakes facility to contemporaneously record when copper wire was removed from the raw material inventory and placed in the WIP inventory in anticipation of production. (*Id.*) Two months after this change, in July 2005, Coleman's bookkeepers observed a spike in the WIP inventory in the Miami Lakes facility that far exceeded their expectations. (Campbell Dep. at 75–76.) Travelers argues that this change in inventory procedures is a "just as plausible, if not more plausible" explanation of the inventory discrepancy. (Travelers' Mem. at 7.) On the other hand, Antonecchia testified that the WIP inventory returned to expected levels after the theft was discovered and that the change in inventory procedures could not have resulted in such a large discrepancy in overall inventory. (Antonecchia Dep. at 49–50, 97, 117.)

### D. Claim Denials

Coleman filed its initial claim with Federal on September 14, 2005. (FSUF ¶ 29.) After many months of investigation and negotiation, Federal notified Coleman on February 29, 2008 of its determination that theft was not covered by the Federal policy, because Coleman had failed to "satisfy the Policy's explicit requirement that the employee who caused the loss be identified." (Federal Mem., Ex. S at 5.)

Coleman also attempted to seek recovery under its policy with Travelers, but Travelers denied its claim on May 15, 2008. (Travelers Mem., Ex. M.) In Travelers' letter denying the claim, Travelers stated: "[A]lthough no employee of Coleman Cable was formally charged in these thefts, it is apparent that an employee was involved in these thefts." (*Id.* at 1.) Thus, Travelers denied Coleman's claim based on the employee theft exclusion in its policy, as well as the inventory shortage exclusion and the $100,000 per occurrence deductible. (TSUF ¶ 44.)

Coleman initiated this lawsuit against Federal and Travelers on September 5, 2008 in the Circuit Court of Lake County, Illinois. (Dkt. No. 1, Ex. 1.) Federal then removed the case to this Court on October 6, 2008. (Dkt. No. 1.)

## II. STANDARD

Both Federal and Travelers move for summary judgment. Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[3] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). This standard places the initial burden on the moving party to identify those portions of the record that "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986). Once the moving party meets this burden of production, the nonmoving party "must go beyond the pleadings" and identify portions of the record demonstrating that a material fact is genuinely disputed. *Id.*; Fed. R. Civ. P. 56©. In deciding whether summary judgment is appropriate, we must accept the nonmoving party's evidence as true, and draw all reasonable inferences in that party's favor. *See Anderson*, 477 U.S. at 255.

## III. ANALYSIS

Federal and Travelers argue that they are entitled to summary judgment, because Coleman has offered insufficient proof of a loss covered by their respective policies. To recover under Federal's policy, Coleman must prove property loss resulting from "[t]heft . . . by an

---

[3] Even though Coleman has waived its right to a jury trial and we are to serve as the finder of fact, the summary judgment standard is the same. (Travelers Reply at 2 n.1.) *See Brotherhood Shipping Co., Ltd. v. St. Paul Fire & Marine Ins. Co.*, 985 F.2d 323, 326 (7th Cir. 1993) (noting that the standard for summary judgment is the same regardless of whether the trial will be by a jury or a judge).

employee[.]" (FSUF ¶ 25.)  Federal's policy also contains a provision stating that if Coleman

seeks to prove the "amount of loss" through a comparison of its inventory records and a physical

count of its inventory, it must "establish[] wholly apart from such comparison that it has

sustained a covered loss caused by an *identified Employee*." (*Id.* ¶ 34 (emphasis added).)  To

recover under Travelers' policy, Coleman must prove property loss from "a Covered cause of

loss"—theft being one of such causes—in excess of the $100,000 per occurrence deductible.

(TSUF ¶¶ 16, 22.)  Travelers' policy also specifically excludes property loss due to employee

theft.  (TSUF ¶ 20.)

  The mutual exclusivity of these policies leaves Coleman in a bit of a quandary based on

the evidence in this case.  As indicated, Coleman has surveillance evidence of thieves stealing

large reels of copper wire from its Miami Lakes facility on September 11 and of similar

attempted thefts on September 25 and October 2.  Besides this surveillance evidence, however,

Coleman's only evidence of property loss from theft is an inventory comparison conducted after

the September 11 theft had been uncovered.  This comparison revealed a discrepancy amounting

to $2,053,146.90 in allegedly missing copper wire.  The trouble for Coleman is that neither

Federal nor Travelers accept that this inventory discrepancy is attributable to theft.  Furthermore,

despite the strong indicia in the surveillance evidence of employee involvement in the September

11 theft and subsequent attempted thefts, Coleman was unable to sufficiently identify, at least in

Federal's view, a specific employee involved in the scheme.  As such, Federal maintains that

Coleman's only proof of pre-September 11 theft—the inventory discrepancy—is barred by the

inventory exclusion in its policy.

  Fearful of losing the lion's share of its claim against Federal to this exclusion, Coleman

is also seeking to recover under its policy with Travelers.  Despite its insistence otherwise for

purposes of Federal's motion, Coleman argues that a reasonable jury could also conclude that no employee was involved with the alleged theft scheme, thereby leaving Travelers potentially on the hook. Unfortunately for Coleman, the evidence it has presented and the mutually exclusive nature of the Federal and Travelers policies preclude it from hedging its bets in this way. As such, the employee theft exclusion in Travelers' policy applies as a matter of law, and, as elaborated below, summary judgment for Travelers is appropriate.

That being said, as discussed fully below, Coleman has offered sufficient evidence to preclude summary judgment for Federal. Coleman's surveillance evidence gives rise to a reasonable—indeed a strong—inference of employee involvement in the theft of copper wire. Coleman has also offered sufficient evidence of involvement by an "identified employee" to allow it to use its inventory evidence in attempting to prove the "amount of loss" attributable to theft to defeat Federal's motion for summary judgment. (FSUF ¶ 34.)

### A. Federal's Motion for Summary Judgment

We begin by considering Federal's motion for summary judgment against Coleman. Because we have diversity jurisdiction and the parties do not argue that another forum's law applies, we apply the law of our forum state, Illinois. *Wood v. Mid-Valley Inc.*, 942 F.2d 425, 426 (7th Cir. 1991). In Illinois, an insured plaintiff seeking to survive summary judgment on an insurance claim must "come forward with some evidence that its claim falls within the terms of the policy [in question]." *Reedy Indus., Inc. v. Hartford Ins. Co. of Ill.*, 306 Ill. App. 3d 989, 994, 715 N.E.2d 728, 731 (1st Dist. 1999). Because Coleman, as the insured plaintiff, is the non-moving party, we accept its evidence as true and draw all reasonable inferences in its favor. *Anderson*, 477 U.S. at 255.

Courts have differed over what type and amount of evidence is sufficient to sustain a claim under an employee theft insurance policy. Federal points to *Gaytime Frock Company v. Liberty Mutual Insurance Company*, a Seventh Circuit case from1945 involving missing inventory at five apparel stores, as setting the relevant standard. 148 F.2d 694, 695 (7th Cir. 1945). In that case, the Seventh Circuit affirmed the district court's verdict for the defendant insurance company following a bench trial on an employee theft claim. *Id.* The Court found that, when an insured relies on circumstantial evidence to prove employee theft, "the evidence to establish that fact must be of such a nature that it is the only conclusion that can fairly or reasonably be drawn, that is to say, such evidence must fairly and reasonably exclude any other explanation." *Id.* The Seventh Circuit later reaffirmed *Gaytime Frock* in *Gillette Company v. Travelers Indemnity Company*, a case involving the alleged theft of $36,980.07 worth of razors, shaving cream, and deodorant. In discussing *Gaytime Frock*, the *Gillete* Court noted that "[t]he important point is that [*Gaytime Frock*] was tried by the [District] Court without a jury and decided against the plaintiff on the ground of insufficiency of proof." 365 F.2d 7, 11 (7th Cir. 1966). But in relying on *Gaytime Frock* and *Gillette*, Federal fails to acknowledge that we are at the summary judgment stage. Thus, we are not bound by the stringent burden of proof applied to the plaintiffs in those cases.

Furthermore, as other circuits have since observed, "[m]ore recent decisions tend to allow an inference of employee dishonesty to be drawn from relatively thin circumstantial evidence and then to permit the full extent of the losses to be proven by inventory comparisons." *Fidelity and Deposit Co. of Md. v. Southern Utilities, Inc.*, 726 F.2d 692, 695 (5th Cir. 1984). Recent cases in this jurisdiction have followed the modern trend. For instance, in *Blitz Corporation v. Hanover Insurance Company*, we permitted an inference of employee theft based

largely on the fact that the allegedly stolen materials, 1702 sanding disks and 29,896 rolls of masking tape, were kept in a warehouse with limited access to non-employees. No. 95-2725, 1996 WL 308233 at *5 (N.D. Ill. June 5, 1996). The only other evidence of employee involvement was the fact that one employee, who had financial difficulties at the time, was found loading two cases of unmarked boxes of the materials on to his truck. *Id.* The employee denied any wrongdoing, however, and a private investigator never uncovered any other evidence of employee theft. *Id.*; *see also Barr Co. v. Safeco Ins. Co. of Am.*, No. 83-2711, 1988 WL 64558, at *7–8 (N.D. Ill. June 15, 1988).

Other courts have also inferred employee theft in cases that involve massive, cumbersome items that would be difficult to steal without help from employees. In a case markedly similar to this one, the Court of Appeals of New York inferred employee theft in the disappearance of 116 reels of copper wire. *Ace Wire & Cable Co., Inc. v. Aetna Casualty & Surety Co.*, 60 N.Y.2d 390, 400, 457 N.E.2d 761, 766 (N.Y. 1983). The court's decision to deny the insurance company's motion for summary judgment was driven in significant part by the fact that the reels "were over four feet in diameter, weighed in excess of two tons and required a fork lift to move (and inferentially a truck to cart away)[.]" *Ace Wire & Cable Co., Inc.*, 60 N.Y.2d at 400–01, 457 N.E.2d 761 at 766. The court also observed that "the missing reels were of two categories the absence of which would not be likely to be detected until a physical inventory was taken, knowledge available only to warehouse employees." *Id.*

But other courts, including the Illinois Court of Appeals, have found insured parties' circumstantial evidence wanting in employee theft insurance cases. For instance, in *Reedy*, the insured plaintiff, a business that serviced HVAC equipment, sought to recover under an employee theft policy for a discrepancy in its inventory of freon gas canisters. 306 Ill. App. 3d

at 991–94, 715 N.E.2d at 730–732.  The plaintiff's only proof of theft consisted of evidence about the business' procedures for securing the canisters and the inventory discrepancy, which, at 439 canisters, was rather large based on the company's history.  *Id.*  The plaintiff's policy, however, contained a $10,000 per occurrence deductible to trigger coverage.  The Illinois Court of Appeals affirmed summary judgment for the defendant insurance company, because the plaintiff had "failed to present any evidence as to the number of occurrences [of theft] and which occurrences, if any, [were] in excess of the deductible."  *Id.* at 995, 715 N.E.2d at 732.

At least one court has also been skeptical of an insured plaintiff's attempt to use limited instances of confirmed theft to prove a prolonged theft scheme.  In *Banner Lumber Company, Inc. v. Indiana Lumbermen's Mutual Insurance Company*, the district court for the Eastern District of Michigan granted summary judgment for an insurance company in a case involving a theft claim based on a general theft insurance policy.  No. 07-13180, 2009 WL 3462510, at *3–6 (E.D. Mich. Oct. 22, 2009).  Despite having confirmed only one occurrence of theft of $750 worth of lumber, the insured plaintiff attempted to attribute a $981,219.50 discrepancy in its lumber inventory to an "ongoing criminal enterprise."  *Id.* at *3.  In rejecting this claim, the court observed: "There is no evidence—only speculation on the part of the Plaintiff—with which to conclude that the theft which occurred on the evening of January 10, 2006 was only the last in a series of an unknown number of thefts by unknown individuals."  *Id.* at *5.

Relying primarily on *Gaytime Frock*, *Gillette*, and *Reedy*, Federal raises two arguments in its motion for summary judgment.  First, Federal argues that the failure of Coleman's video surveillance system to capture any evidence of theft of copper wire prior to September 11, 2005 means that Coleman cannot prove any such theft occurred.  (Federal Mem. at 8–10.)  Second, Federal argues that an exclusion in its policy precludes Coleman from relying upon its only

evidence of pre-September 11 theft, an inventory comparison, because it has failed to show that an "identified employee" was involved with the theft. (*Id.* at 10–15.)

Implicit in both these arguments is an admission that Coleman was the victim of theft on September 11, 2005. Indeed, Coleman points to the surveillance evidence of this theft and the two subsequent attempted thefts to argue that it was the victim of a theft scheme involving Coleman employees during much of 2005. (Resp. at 10–15.) According to Coleman, its lack of surveillance evidence of theft predating September 11 does not definitively establish that no such theft occurred. (*Id.* at 14–15.) Coleman points to testimony regarding gaps in its two surveillance systems to explain this lack of evidence. (*Id.*) Furthermore, Coleman argues that it is not precluded from relying on inventory evidence to prove pre-September 11 theft, because it has offered sufficient evidence of involvement in the theft scheme by an "identified employee," as is required by the Federal policy. (*Id.* at 19–22.)

We conclude that Coleman's surveillance evidence would allow a reasonable jury to conclude that a theft scheme involving the employees at its Miami Lakes facility existed in 2005. We also conclude that Coleman's lack of surveillance evidence of pre-September 11 theft does not eviscerate its claim that such theft occurred. Next, we determine that Coleman has offered sufficient evidence of involvement by an "identified employee" to allow it to use inventory evidence to prove the extent of its loss from the theft scheme. Thus, we deny Federal's motion for summary judgment.

### 1. Coleman's Surveillance Evidence Supports a Reasonable Inference of Employee Involvement in a Scheme to Steal Reels of Copper Wire.

Coleman has produced surveillance evidence of three obviously related incidents of theft and attempted theft during September and October 2005. Indeed, the surveillance evidence from September 11 in particular shows a scheme unfolding according to a plan presaged almost

exactly by the court in *Ace Wire & Cable*: thieves using a fork lift to load large reels of copper wire on to a truck and then proceeding to cover their tracks to avoid detection. But unlike the court in *Ace Wire & Cable*, we need not merely infer from the nature of what was stolen that employees were involved. Instead, Coleman has also proffered testimony from its employees, Joe Antonecchia and Cliff Sanderson, about knowledge unique to Coleman employees that the thieves appear to possess in perpetrating their scheme.

Coleman's surveillance footage from September 11, 2005 provides strong evidence of employee involvement in the theft.[4] The first pertinent image is that of an individual, who appears to be a man and who quickly reveals himself to be a thief, walking at a steady pace and in a consistent direction across the facility outside normal working hours. Curiously, Coleman's system of sixteen surveillance cameras, many of which were trained on the entrances to the facility, failed to capture how the thief got inside the facility. (Antonecchia Dep. at 29.) Significantly, the Miami Police failed to find evidence of forced entry after the theft was discovered, which, according to the detective who investigated the case, is a good indicator of employee involvement. (Toyos Dep. at 69–70.)

The September 11 surveillance footage also shows an individual who appears to have significant amounts of knowledge unique to Coleman employees. After first walking steadily in one direction, the thief then turns right and walks off screen before coming back along the same path after a brief period of time. According to the testimony of Clifford Sanderson, a Coleman employee familiar with the facility, the area to which the thief appears to be heading is where an office containing the keys to the facility's forklift would have been located at the time. (Sanderson Dep. at 66.) The thief then proceeds to use the forklift to move the reels of copper

---

[4]     Having provided extensive citation to specific points in the surveillance footage in our recitation of the facts, we omit such citation here for the sake of easier reading. Where appropriate, we continue to cite to relevant deposition testimony and other evidence.

wire, each of which weighs thousands of pounds.  According to Sanderson and Antonecchia, the

thief also appears to use the forklift to move reels of lower-value material out of the way to

access higher-value pure copper wire.  (*Id.* at 66–67.)  From this evidence of particularized

knowledge, a jury could reasonably conclude that the individual operating the forklift is either a

Coleman employee himself or is working closely with one.

While the forklift-operating thief is inside the facility, a second thief drives a flatbed

truck up to a loading bay on the exterior of the facility.  Next, the forklift-operating thief, who

must have known where to find a second set of necessary keys, appears to unlock the padlock on

the loading bay door.  (*Id.*)  He and the truck-driver promptly load the reels of copper wire on to

the truck, which drives away shortly thereafter.  Meanwhile, the forklift-operating thief attempts

to conceal evidence of the theft by returning various materials, the forklift, and two sets of keys

to the places from which they had come.  In this footage, it is also obvious that the forklift-

operating thief, unlike the truck-driving thief, is wearing some sort of mask over his face.  This

evidence of concealment could suggest two things to a reasonable jury.  First, the thief is an

employee and is therefore particularly conscious of how his actions might be traced.  *See, e.g.*,

*Ace Wire & Cable Co.*, 60 N.Y.2d at 400–01, 457 N.E.2d at 766.  Second, the thief intended to

conceal his conduct to facilitate future thefts.

At the very least, the second inference finds strong confirmation in the record.  On

September 25 and October 2, the surveillance system recorded incidents strikingly similar to the

September 11 theft.  Although the latter two were ultimately unsuccessful, all three incidents

share a similar modus operandi: two thieves, one inside the facility moving the reels of copper

and opening the loading bay doors, another driving what appears to be the same flatbed truck,

and after-the-fact attempts at concealment.  (R-FSUF ¶¶ 65–66.)  As we recounted in laying out

the facts, these incidents also all occurred around the same time—at night, outside of normal operating hours, on three out of four consecutive weekends. Lest there be any doubt about the connection between them, the record confirms that at least the September 11 and October 2 incidents were perpetrated in part by the same person, Luis Cruz. After being caught fleeing from the scene on October 2, Cruz later pled guilty to being the truck-driver depicted in both the October 2 and September 11 incidents. (FSUF ¶ 16.) The police also arrested and charged another individual, Juniel Moreno, who they suspected of acting as a lookout. (Toyos Dep. at 22–23.) Neither Cruz nor Moreno were Coleman employees. The police were unable, however, to name or apprehend the forklift-operating thief. (*Id.* at 66–67.)

Taken together, this evidence places Coleman in a far better position than the plaintiffs in the cases upon which Federal relies. Unlike *Reedy*, where the plaintiff could not point to any occurrences of theft, Coleman can point to three related incidents of theft and attempted theft. 306 Ill. App. 3d at 995, 715 N.E.2d at 732. The specialized knowledge the thieves displayed in stealing such large, cumbersome reels of copper wire also strongly suggests employee involvement. *Ace Wire & Cable Co.*, 60 N.Y.2d at 400–01, 457 N.E.2d at 766. This case is thus easily distinguishable from the facts of *Gaytime Frock* and *Gillette*. In those cases, the plaintiffs lacked surveillance evidence of thieves acting in a manner that is highly suggestive of employee involvement, as Coleman has here. 148 F.2d at 694–95; 365 F.2d at 9–10. Drawing all reasonable inferences in its favor, Coleman has met its burden of "com[ing] forward with some evidence that its claim falls within the terms of the policy [in question]." *Reedy*, 306 Ill. App. 3d at 994, 715 N.E.2d at 732.

### 2. Coleman's Lack of Surveillance Evidence of Pre-September 11 Theft Does Not Mean That No Such Theft Occurred.

Given the strength of Coleman's surveillance evidence of employee theft on September 11 and afterwards, Federal points to Coleman's lack of surveillance evidence of pre-September 11 theft in an attempt to substantially narrow Coleman's claim. But Federal's argument is a factual dispute more appropriately resolved at trial.

Coleman has offered evidence demonstrating that gaps in both the old and new surveillance systems explain how an ongoing theft scheme could have gone undetected until the September 11 incident. Joe Antonecchia testified that the old surveillance system in the Miami Lakes facility remained in place until July of 2005. (Antonecchia Dep. at 19.) This system only had six cameras and limited capacity to record images in the dark. (*Id.* at 15.) Furthermore, the loading bay doors through which the reels of copper were removed on September 11 and October 2 were not under surveillance at all times during 2005. (*Id.* at 147.) When Antonecchia became plant manager in the summer of 2005, Coleman also had no policy as to how often the surveillance footage should be reviewed, although such a policy came in to effect with the installation of the new system. (*Id.* at 18.) But even the new system had gaps in coverage, as evidenced by the system's failure to record the forklift-operating thief's entry on September 11. (Antonecchia Dep. at 29.) This explanation, which we accept as true for the time being, is sufficient for purposes of summary judgment. *See Anderson*, 477 U.S. at 255.

Moreover, the strong similarity between the three incidents of theft and attempted theft for which Coleman does have surveillance evidence suggests an "ongoing criminal enterprise" in a way that the single incident in *Banner Lumber* did not. 2009 WL 3462510, at *3. In addition to the greater number of incidents, the surveillance evidence also gives rise to a reasonable inference that the thieves had perpetrated this type of heist before at the Miami Lakes facility.

Particularly in the September 11 footage, the operation unfolds with ease and efficiency. Indeed, there are few if any signs of the snags one might expect from a first-time operation of this magnitude. In remarking on the September 11 surveillance evidence, Detective Toyos, the police officer who investigated the case, commented that the thieves looked like they had "done this so many times that they were very comfortable[.]" (Toyos Dep. at 66.) Thus, unlike in *Banner Lumber*, a reasonable jury could infer that the three incidents for which Coleman has surveillance evidence were in fact the "last in a series of an unknown number of thefts." 2009 WL 3462510, at *5. Of course, a reasonable jury could conclude otherwise, but that is why this case must be tried.

### 3. Coleman Has Offered Sufficient Evidence of Involvement by an "Identified Employee" in the Theft Scheme to Use Inventory Evidence to Prove the Extent of its Loss.

Federal's policy limits Coleman's ability to use an inventory comparison to "prove the amount of loss" from employee theft to those situations where "[the insured] establishes wholly apart from such comparison that it has sustained a covered loss caused by an identified [e]mployee." (FSUF ¶ 34.) Federal argues that Coleman has failed to offer sufficient evidence that an "identified employee" was involved with the theft. Thus, in Federal's view, Coleman has no evidence of theft other than that which occurred on September 11 and afterwards, and summary judgment for Federal on the remainder of Coleman's claim is appropriate. We disagree.

The type of exclusion upon which Federal relies, known as an inventory shortage exclusion, is hardly new to the insurance industry. *See Dunlop Tire and Rubber Corp. v. Fidelity and Deposit Company of Maryland*, 479 F.2d 1243, 1246 (2d Cir. 1973) (noting that such provisions have been standard in employee theft policies "for a number of years"). As the court

in *Reedy* discussed, inventory shortage exclusions have long been used "to curb abuses by employers insured against employee dishonesty where covered losses were claimed on the basis of mere estimates, but where the losses might actually be the result of bookkeeping errors, waste or negligence." 306 Ill.App.3d at 995, 715 N.E.2d at 732. But we have not understood such clauses to bar inventory evidence altogether. For instance, in *Blitz*, we narrowly construed the meaning of the phrase "inventory computation" in an insurance contract that barred the insured plaintiff from recovering for any "loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon . . . an inventory computation[.]" 1996 WL 308233 at *2. In construing the phrase against the insurance company that drafted the contract, we determined that the insured plaintiff's use of packing and shipping receipts to identify specific missing items was not an "inventory computation" within the meaning of the policy. *Id.* at *4. We adopted this construction based on our observation that "[f]or more than twenty years . . . the trend has been toward allowing inventory evidence to be used to prove the amount of the loss where there is sufficient independent evidence of employee dishonesty." *Id.* at *2.

What makes this case unusual compared to prior precedent is the requirement in Federal's policy that Coleman must prove that its loss stemmed from theft by an "identified employee" before it can use inventory evidence to prove the extent of its loss. (FSUF ¶ 34.) Our research has not revealed any cases involving similarly-worded inventory shortage exclusions. Thus, we must attempt to determine the meaning of the phrase "identified employee" as used in the Federal policy.

In interpreting this phrase, we are mindful that "a court's primary objective in construing the language of [a] policy is to ascertain and give effect to the intentions of the parties as expressed in their agreement." *American States Ins. Co. v. Koloms*, 177 Ill.2d 473, 479, 687

N.E.2d 72, 75 (Ill. 1997).  Where the policy's terms are clear and unambiguous, we must give

them their "plain and ordinary meaning."  *Id.*  A term is ambiguous "only if the term is

susceptible to more than one reasonable interpretation."  *Nicor, Inc. v. Assoc. Elec. And Gas Ins.*

*Servs. Ltd.*, 223 Ill.2d 407, 417, 860 N.E.2d 280, 286 (Ill. 2006).  But if the terms of the policy

are ambiguous, "they will be construed strictly against the insurer who drafted the policy."

*American States Ins. Co.*, 177 Ill.2d at 479, 687 N.E.2d at 75.  Illinois courts also adhere to the

principle in the insurance context that "provisions that limit or exclude coverage will be

interpreted liberally in favor of the insured and against the insurer."  *Id.*  We must also not view

a particular phrase in isolation but must instead "construe the policy as a whole and take into

account the type of insurance purchased, the nature of the risks involved, and the overall purpose

of the contract."  *Id.*

   With these principles in mind, we conclude that the phrase "identified employee" is

ambiguous and must be construed against Federal.  Federal contends that the phrase "identified

employee" means that Coleman must prove "that a specific employee engaged in theft."

(Federal Mem. at 12.)  Coleman argues, however, that it must only show "that someone *who can

be identified as an employee* contributed to the thefts."  (Resp. at 20 (emphasis original).)  We

agree with Coleman that the phrase "identified employee" encompasses more than one

reasonable meaning.  The phrase "identified employee" could mean, as Federal contends, a

specifically named employee.  But there are also ways in which an "employee" could be

"identified" short of being specifically named.  For instance, where an individual evinces

specialized knowledge that only an employee of a particular organization would have, that

individual can be sufficiently "identified" as an "employee" of that organization.

In fact, this construction of the word "identified" is commonly employed in situations like this one in which surveillance evidence is involved. One can imagine an evening newscast in which the anchor narrates how the police have, based on surveillance evidence, "identified" a suspected thief with certain characteristics. Although the suspect might not be "identified" in the sense of being named, that person is "identified" in the sense of having those distinguishing characteristics. The phrase "identified employee" is thus "susceptible to more than one reasonable interpretation" and is ambiguous as a matter of law. *American States Ins. Co.*, 177 Ill.2d at 479, 687 N.E.2d at 75.

Given that we must construe any ambiguity against Federal, we hold that Coleman has sufficiently demonstrated theft by an "identified employee" to allow it to use inventory evidence to prove the scope of that theft. Specifically, a reasonable jury could conclude that the forklift-operating thief shown in the September 11 surveillance footage can be "identified" as a Coleman employee based on his having knowledge unique to Coleman employees. This conclusion best honors the general principle in Illinois law that "provisions that limit or exclude coverage will be interpreted liberally in favor of the insured and against the insurer." *American States Ins. Co.*, 177 Ill.2d at 479, 687 N.E.2d at 75.

We also reject Federal's argument that this construction renders the "identified employee" requirement superfluous. (Federal Reply at 14.) As indicated, the purpose of inventory shortage exclusions is "to curb abuses by employers insured against employee dishonesty where covered losses were claimed on the basis of mere estimates, but where the losses might actually be the result of bookkeeping errors, waste or negligence." *Reedy*, 306 Ill. App. 3d at 994, 715 N.E.2d at 732. But the facts of this case do not suggest an insured employer seeking to pawn off its negligent bookkeeping on an insurance company. The evidence here

amounts to much more than an unexplained gap in Coleman's inventory. As we have discussed at length, the surveillance evidence shows that Coleman was the victim of at least three incidents of theft and attempted theft. The fact that Coleman has been unable to name the forklift-operating thief should not vitiate what is an otherwise durable employee theft claim. In the future, another plaintiff who lacks video evidence of a particular culprit with knowledge specific to employees may see its claim precluded by this provision. But Coleman is not that plaintiff. Thus, the inventory shortage exclusion, although not superfluous, is also not fatal to Coleman's claim.

Lastly, we also hold that Coleman has also offered evidence from which a reasonable jury could conclude that a specifically named employee, Faustino Miro, was involved with the theft. While the evidence against Miro falls far short of proof beyond a reasonable doubt, that is not the applicable standard. The photographs of Miro propping open the door comprising the thieves' suspected point of entry only hours before the final attempted theft is sufficiently suspicious to allow a reasonable jury to conclude that Miro was helping to facilitate the scheme. (Resp., Ex. 15.) This inference is further buttressed by Antonecchia's specific instruction to Miro to keep the door closed and locked. (Antonecchia Dep. at 60.) Especially given the dearth of evidence of forced entry, Miro's actions are sufficient to permit the conclusion that he is an "identified employee" involved in the theft.

Coleman's evidence with respect to Miro's involvement is comparable to the insured plaintiff's position in *Blitz*. In that case, the insured company had evidence that a driver it employed had been found loading two unmarked cases of the types of items alleged to have been stolen on to his truck. 1996 WL 307233, at *5. A private investigator hired to look in to the alleged theft was unable to rule out the employee as a suspect based on his answers in an

interview. But the employee, who denied the theft, was never arrested or charged in the matter. Nevertheless, the court concluded that "it would be possible for the trier of fact to find that this employee was responsible for some or all of the missing product." *Id.* Admittedly, we do not have the benefit of Miro's responses to an investigatory interview in this case. But in light of the other facts of this case—especially the curious lack of evidence of forced entry—the evidence against Miro could lead the trier of fact to conclude that he was involved in giving the thieves access to Coleman's Miami Lakes facility.[5]

Thus, under either definition of the phrase "identified employee," Coleman has offered sufficient "independent evidence" of employee involvement with the theft to allow it to use inventory evidence to prove the extent of its loss. *Id.* at *2. We therefore deny Federal's motion for summary judgment.

---

[5] Coleman has also proffered evidence that Cruz, the individual who pled guilty to acting as the truck driver in the theft scheme, named a Coleman employee, Joe Ramos, as his "inside guy." (Resp., Ex. 7.) Although this issue was not adequately briefed by the parties, we agree with Federal that this evidence is likely inadmissible hearsay. (Federal Mem. at 13, n.12.) As such, we will not rely on it for summary judgment purposes. *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) ("[A] court may consider only admissible evidence in assessing a motion for summary judgment.")

Federal also argues—albeit in a footnote—that the images of Miro propping open the door to the Coleman facility are inadmissible because Coleman destroyed the subsequent video of the hours in between this incident and the thieves entry into Coleman's facility on October 2. (Federal Reply at 10 n.8.) Federal has inadequately presented its argument as to why we must exclude this evidence or draw a negative inference from the absence of surveillance images from the intervening hours. On the other hand, Antonecchia stated in an affidavit that surveillance footage was only maintained for approximately seven to ten days before being "written over due to lack of memory" by the recording system. (Antonecchia 8/5/10 Dec. ¶ 2.) The only reason the images of Miro were not erased is because Antonecchia chose to export the files from the recording system to his personal computer. (*Id.* ¶¶ 3–6.) Given that Antonecchia, who is not an attorney, saved only those images he thought relevant, we are not prepared to draw a negative inference from his failure to save several hours worth of images of what apparently was, in his layman's view, seemingly irrelevant inactivity. While we reach no final conclusion on this issue in light of the parties' failure to raise it adequately, we accept for purposes of Federal's summary judgment motion that the images of Miro propping open the door through which one of the thieves later entered are admissible.

## B.     Travelers' Motion for Summary Judgment

We now turn to Travelers' motion for summary judgment.  Like Federal, Travelers hones in on Coleman's exclusive reliance on inventory evidence to prove pre-September 11 theft in an attempt to substantially winnow Coleman's claim.  (Travelers' Mem. at 3–12.)  Having already concluded that Coleman's evidence is sufficient to give rise to a reasonable inference that a theft scheme predating September 11 existed at its Miami Lakes facility, we will not revisit those arguments again.  Unlike Federal, however, Travelers can point to an unambiguous policy exclusion that precludes Coleman's claim against it.

In Illinois, an insurance company seeking to show that a claim falls within a policy provision limiting or excluding coverage bears the burden of showing that the provision applies.  *Reedy*, 306 Ill. App. 3d at 994, 715 N.E.2d at 732.  In this case, it is undisputed that Coleman's policy with Travelers contains an unambiguous exclusion for property loss due to employee theft.  (TSUF ¶ 20.)

Travelers has little trouble proving this exclusion applies, because Coleman has largely done Travelers' work for it.  After amassing significant evidence that one or more of its employees was involved with the theft of copper wire, Coleman conducts an abrupt about face and posits that "[i]t is possible, however, that the jury will find otherwise."  (Resp. at 18.)  Coleman's basis for making this argument is the fact that Cruz, the only individual convicted of the theft, was not a Coleman employee.  (*Id.*)  And yet, the vast majority of Coleman's evidence of employee involvement relates to the unique knowledge displayed by the masked forklift-operating thief, who has not been named or apprehended.  (Toyos Dep. at 66–67.)  Taking a holistic view of the evidence, the mere fact that Cruz, the truck-driving thief, is not an employee does not mean that Coleman's claim against Travelers should go to trial.  Travelers' policy

exclusion applies whether employees are "[a]cting alone or in collusion with others[.]" (TSUF ¶ 20.) Thus, we conclude that Coleman does not genuinely dispute that one of its employees was involved with the theft scheme at its Miami Lakes facility. *See* Fed. R. Civ. P. 56(a) (requiring summary judgment when "there is no genuine dispute as to any material fact"). Because its policy unambiguously excludes claims based on employee theft, summary judgment for Travelers is appropriate.

## IV. CONCLUSION

In short, Coleman has adduced sufficient evidence of a theft scheme involving identified employees at its Miami Lakes facility to both exclude Travelers' liability and to permit its claim against Federal to proceed forward. We deny Federal's motion for summary judgment and grant Travelers' motion for summary judgment. It is so ordered.

Honorable Marvin E. Aspen
U.S. District Court Judge

Date: May 13, 2011